THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TOMMY L. COLEMAN, Defendant-Appellant.

Fourth District   No. 4—88—0722

Opinion filed August 24, 1989.—Modified on denial of rehearing
September 25, 1989.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial, defendant was convicted of first degree murder, armed robbery, and robbery, in violation of sections 9—1, 18—2, and 18—1, respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1, 18—2, 18—1). The circuit court of Sangamon County sentenced defendant to a term of 30 years' imprisonment for murder and 15 years' imprisonment for armed robbery. The sentences were to be served concurrently. Judgment was not entered on the robbery conviction. Defendant appeals his convictions. We affirm.

On appeal, defendant argues: (1) the trial court erred in allowing the admission of prior inconsistent statements by prosecution witnesses because the witnesses did not have "personal knowledge" of the events discussed in their statements as required by section 115—10.1 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1); and (2) the State's Attorney committed reversible error in his opening statement by discussing the expected testimony of a prosecution witness who later failed to appear and testify at the trial. The pertinent facts follow.

The charges against defendant stem from an incident in which a woman was shot outside a residence at 726 North Seventh Street in Springfield. She died of her wounds at the hospital. The trial was held over three days, beginning August 9, 1988.

In opening statement, the State's Attorney detailed some of the evidence the State was going to produce. In particular, the State's Attorney discussed the expected testimony of Cammona Gailes, who the jury was told had purchased the murder weapon for police from a co-defendant. Cammona Gailes did not testify at trial. She was subpoenaed, but she did not appear. Efforts to locate her were unsuccessful.

Detective Tom Murphy testified that he was approached by a woman named Cammona Gailes, who offered her help in regards to the murder investigation. Gailes' nickname is "Mopey." Murphy testified Gailes "flagged down" Murphy's car at approximately 11:30 p.m. on April 13, 1988. After a discussion with police, Gailes agreed to purchase what was believed to be the murder weapon. Murphy gave her $70 to do so. At approximately 11:50 p.m. the next day, April 14, Gailes returned to the police with a .22 caliber handgun. Murphy testified on the second day of trial. He stated that he had made several attempts to locate Gailes, but he could not find her.

The gun was later examined scientifically, but the results were inconclusive.

On May 3, 1988, Detective Murphy arrested defendant at his place of employment and transported him to the police station. He

and Detective Steve Pellegrini questioned defendant. Prior to questioning, defendant was given the *Miranda* warnings. Defendant initially denied any involvement in the incident. Murphy then showed defendant the .22 caliber handgun. Murphy testified that, at that point, defendant stated he had not been truthful. Defendant broke down crying and offered to tell the truth.

Murphy testified that defendant gave a verbal confession to robbing the victim of her purse. Defendant stated his companion, Deearlise Childrous, shot the victim after defendant had wrestled the purse from her. Following this verbal confession, defendant was asked to sign a written waiver of his *Miranda* rights. This he did. Defendant was also asked to give a written statement. Defendant agreed to do so, and Detective Murphy wrote the statement as defendant spoke. However, defendant did not sign the statement. Murphy was allowed to read defendant's statement to the jury.

Detective Pellegrini testified and corroborated Murphy's testimony concerning the circumstances surrounding the giving of defendant's statement. Pellegrini stated that defendant read the statement after it was finished, but he declined to sign it.

Two witnesses, Angela Johnson and LaMarques Johnson, were called to testify for the State. Angela, 15 years old, and LaMarques, 16 years old, were both in the tenth grade. Both of the witnesses acknowledged that they had voluntarily approached the police with information concerning the murder. When questioned about the information at trial, the witnesses claimed they could not remember. Both of the witnesses acknowledged that they gave written statements to police. The witnesses were shown statements, which they acknowledged as their statements. However, both witnesses proved difficult and continued to claim lack of memory as to the events. The State's Attorney was allowed to read from the witnesses' statements in an attempt to refresh their memories. In their statements, the witnesses had stated they were present when defendant and Deearlise Childrous made incriminating statements in conversation to each other or to the witnesses. The court overruled defendant's objections to the reading of the statements. The court found the statements to be prior inconsistent statements admissible under section 115—10.1 of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1).

Defendant testified on his own behalf. He acknowledged that he was questioned by police on May 3, 1988. However, he stated the subject of the questioning was another murder—the death of a security guard at a local motel. Defendant denied making the statement which was read by Detective Murphy and denied any knowledge of the inci-

dent. He stated he had never seen the .22 caliber handgun before. The court allowed defendant's statement to go to the jury, but did *not* allow the statements of Angela and LaMarques Johnson to go to the jury.

After retiring for their deliberations, the jury requested the statements of Angela and LaMarques Johnson. The court denied their request, stating "I have delivered to you all exhibits which you may receive." The jury found defendant guilty of murder, armed robbery, and robbery.

Defendant first argues the trial court erred in allowing the State to read into evidence Angela and LaMarques Johnson's prior statements to police. Defendant argues the statements were not admissible under section 115—10.1 because the witnesses did not have personal knowledge of the events discussed in their statements. Rather, the statements consisted of admissions against interest by defendant and a codefendant, which were heard by the witnesses who were present during these conversations. The following quotations are of the pertinent phrases from Angela's statement read into the record by the State's Attorney:

> "Tommy said to Deearlise, 'You shot her,' and Deearlise said, 'If he would not had snatched the purse I would not of had to shot her,' ***."

> "Me, Tommy, and Theodis were at the house, and Mopey came over. I don't know what her real name is, but that's what people call her. The first time she came over me and Tommy were upstairs in his room. He went downstairs to answer the door, and I heard Mopey's voice, and after she left Tommy came up and told me it was Mopey. We went back to his room, and [we] stayed up there for a while, and Mopey came back ***, I know it was Mopey because Tommy said she was coming back to buy the .22 that Deearlise had used to shoot the lady. I knew that it was the gun they used because Tommy and Deearlise both told me it was the one."

The following quotation is from the statement of LaMarques, which the State's Attorney read into evidence:

> "I saw a black .22 caliber handgun with white grips and was eight to ten inches long in a holster laying on the couch. I started to pick the gun up, but Tommy told me not to touch it and get my fingerprints on it. He said that it was the gun used in the murder. Tommy told me that the night that it happened that he and Deearlise were out to make some money. Tommy told me that he didn't get scratched and that he had already

thrown his jacket away. Tommy told me he already sold the gun to a black female called Mopey."

Section 115—10.1 of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1) provides for the admissibility of prior inconsistent statements under certain specific conditions:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein."

The controversy in this case centers around subsection (c). Subsection (c) is written in the disjunctive. Defendant argues the witnesses' statements do not meet the criteria found in subsection (c)(2) because the witnesses did not have "personal knowledge" of the events discussed in their statements. Defendant defines personal knowledge to mean the witness must have personally observed the underlying events. Simply overhearing incriminating statements made by a defendant is not enough. Defendant's argument is supported by case law, legislative history, and secondary sources. It should be noted that under subsection (c)(1), if the statements were made at a previous proceeding where sworn testimony was received, the statements need not meet the personal knowledge requirement.

■■■ Our courts have generally summarized section 115—10.1 by stating that a prior inconsistent statement may be used as substantive evidence: (1) if it is inconsistent with the witness' trial testimony; (2) the witness is subject to cross-examination at trial; (3) the statement explains an event within the personal knowledge of the witness; and (4) the witness acknowledged at trial that he had made the prior inconsistent statement. (*People v. O'Neal* (1985), 139 Ill. App. 3d 791, 794, 488 N.E.2d 277, 279; *People v. Hastings* (1987), 161 Ill. App. 3d 714, 719, 515 N.E.2d 260, 264.) In *Hastings*, the court briefly discussed the third requirement:

> "The third requirement is that the statement must relate to circumstances, the subject matter of which is within that witness' personal knowledge. To be within the personal knowledge of a witness, the witness must have observed, and not merely have heard, the subject matter underlying the statement. (Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638, 640 (1984).) In the instant case, the statements admitted into evidence concerned the observations of Fazell at the time of the occurrence. Therefore, being within the personal knowledge of Fazell, the third requirement is met." (*Hastings*, 161 Ill. App. 3d at 720, 515 N.E.2d at 264.)

In *Hastings*, the court adopted the definition, asserted by defendant, that personal knowledge means more than being present when defendant makes incriminating statements. The witness must have personally observed the subject matter of his statement.

The definition of personal knowledge adopted in *Hastings* is supported by secondary sources. Justice Steigmann states in his article that he authored the Senate bill which became section 115—10.1. His assertion is that excluding hearsay statements of witnesses which are not based on personal observation is necessary to counter the coercion inherent in station house interrogations:

> "Because (c)(2) statements, by definition, are not those made in the dignified, noncoercive atmosphere of a courtroom or hearing room, but instead are likely to be made during a police interrogation, a limitation was placed on the admissibility of such statements. This limitation requires that the statement be based on the personal knowledge of the witness, as opposed to what the witness was told by some third party. This limitation was imposed because of concerns about having words put in the mouths of witnesses under circumstances far different from those in a courtroom or a hearing room. Even in a grand jury

inquiry, the questions are being asked by a prosecuting attorney, not a police officer, and 23 citizens and a court reporter are present to watch and record the proceedings. These are far different conditions from those in the usual stationhouse questioning." (Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638, 640 (1984).)

The motivating force for Justice Steigmann and the legislators who sponsored the bill was an article written by Professor Graham of the University of Illinois Law School. Professor Graham supported the narrower definition of personal knowledge, in which "only 'first-hand hearsay' would be admissible; admission-confessions, the least reliable and most damaging evidence to the criminal defendant, would not be admitted as substantive evidence even if the alleged admission is contained in a signed statement of the in-court witness, unless the declarant also had personal knowledge of the underlying event." Graham, *Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613 & 607*, 75 Mich. L. Rev. 1565, 1587-88 (1977).

The legislative discussion just prior to the final vote on section 115—10.1 incorporates a portion of Professor Graham's law review article. One legislator was anxious that the legislative history be complete. He read into the record a portion of Professor Graham's article, which specifically included the limited definition given to personal knowledge. 83d Ill. Gen. Assem., House Proceedings, Nov. 1, 1983, at 38 (statements of Representative Cullerton).

Against this backdrop of authority, the State argues the plain meaning of the statute allows for the admission of overheard incriminating statements uttered by a defendant. The statute requires that the prior statement concern "an event or condition of which the witness had personal knowledge." (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1(c)(2).) The State contends the plain meaning of the term "event" includes statements uttered by a defendant. Therefore, the State continues, there is no need to resort to legislative history or secondary sources.

■ We reject the State's argument and find the overwhelming authority supports defendant's interpretation of the personal knowledge requirement of section 115—10.1(c)(2). Using this more limited definition, it is clear that the statements of Angela and LaMarques Johnson were not admissible under subsection (c)(2). The statements consisted mainly of admissions—confessions of defendant and Deearlise Childrous overheard by the witnesses. Although we conclude

that the statements were not admissible under subsection (c)(2), we need not reverse the result.

The State argues, in the alternative, that the witnesses' statements were admissible under subsection (c)(1) as statements made in a prior judicial proceeding.

The record in this case contained the minutes of the grand jury proceeding of July 28, 1988, in which evidence was presented against defendant, and an indictment was eventually returned. Both Angela and LaMarques were called to testify before the grand jury.

Their testimony before the grand jury consisted of the following pattern. Each witness testified they gave a statement to police which was written down by Detectives Murphy and Pellegrini; the witnesses identified their signatures on the statements; the statements were read to the grand jury by the assistant State's Attorney; the witnesses identified the statements as their own; and the witnesses verified the accuracy and truth of the statements. The State argues the process whereby the witnesses' statements were read by the prosecutor and verified by the witnesses fulfills the requirement of making a statement "under oath at a trial, hearing, or other proceeding." (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1(c)(1).) We agree.

■■ ■ A grand jury proceeding qualifies as a "trial, hearing, or other proceeding" under subsection (c)(1). Therefore, testimony given in a grand jury proceeding is admissible as a prior inconsistent statement. (*People v. King* (1986), 109 Ill. 2d 514, 527-30, 488 N.E.2d 949, 956-57; *People v. Atkins* (1987), 161 Ill. App. 3d 600, 611-12, 515 N.E.2d 272, 279; see also Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638, 640 (1984).) In this case, the prosecutor read the witnesses' statements to the grand jury and carefully questioned the witnesses regarding the authenticity and the accuracy of the statements. We find this sufficient to qualify the statements as subsection (c)(1) statements and make them admissible as substantive prior inconsistent statements. In so finding, we emphasize that the facts now before us bring the case under subsection (c)(1) because the witness "under oath at a trial, hearing, or other proceeding" (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1(c)(1)) not only admitted to having made a previous statement, but verified its accuracy, whereas subsection (c)(2)(B) would have applied if the witness at the grand jury hearing acknowledged having made such a statement but had not verified its accuracy. With regard to the first situation, where the witness restates the statement and verifies it, these circumstances cannot be distinguished from the normal questioning of witnesses that takes place at such hearings.

We note that section 115—10.1 is a relatively recent addition to the Code of Criminal Procedure of 1963. There are not many cases discussing the application of this section. Also, we note that the trial court in the instant case ruled the statements admissible under section 115—10.1 without explaining which subsection provided the basis for admissibility. We wish to add a postscript concerning the procedure that should be used at trial when the State seeks to admit the statements under subsection (c)(1). Where the State wishes to rely on the fact that prior statements were made under oath, we believe the better practice is to enter the record from the prior proceeding into evidence at the trial. The trial court would retain the discretion to allow the jury to receive that evidence, as well as the statements themselves. Nevertheless, it is better to have the prior proceedings before the trial court in order to clarify the basis for admissibility, and in order to allow the court and both parties to fully ascertain the circumstances surrounding the prior statements.

Defendant's second argument is that the State's Attorney committed reversible error when he discussed the expected testimony of Cammona Gailes, but then failed to produce her at trial. The State responds by pointing out the failure to produce Gailes was unintentional, and such errors have been held to be harmless.

The record indicates the State's Attorney acted in good faith. The State's Attorney explained the expected testimony of Gailes in his opening argument. The record indicates Gailes could not be found, although several attempts had been made to locate her. The testimony concerning Gailes' purchase of the murder weapon was introduced through Detective Murphy. Outside of his error in opening statement, the State's Attorney faithfully limited his discussion of Gailes' participation in obtaining the murder weapon to the facts elicited from Detective Murphy.

■■ ■ An opening statement in a criminal case should be an outline of the facts which the prosecution, in good faith, expects to prove. (*People v. Wills* (1987), 153 Ill. App. 3d 328, 342, 505 N.E.2d 754, 763.) It is improper, at least with foreknowledge, to include matters in an opening statement which are not thereafter proved. (*Wills*, 153 Ill. App. 3d at 342, 505 N.E.2d at 763.) However, reversible error occurs only where such impropriety is attributable to the deliberate misconduct of the prosecution and results in substantial prejudice to defendant. (*Wills*, 153 Ill. App. 3d at 342, 505 N.E.2d at 763.) We find no reversible error occurred in this case. The failure of Gailes to testify was not intentional misconduct by the State. Further, in addition to the testimony of Detective Murphy, the fact that Gailes pur-

chased the murder weapon was an inherent part of the prior statements of Angela and LaMarques Johnson. The State's Attorney limited his discussion of Gailes to the testimony properly admitted into evidence. There was no prejudice to defendant.

For the reasons stated above, the order of the circuit court of Sangamon County is affirmed.

Affirmed.

SPITZ and GREEN, JJ., concur.